[10] and [11]

**For Publication**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

_____
                                    :
FERENCE, <u>et</u> <u>al.</u>,                   :
                                    :   Civil Action No.: 05-CV-05988(FLW)
                    Plaintiffs,     :
                                    :        **Opinion**
        v.                          :
                                    :
TOWNSHIP OF HAMILTON, <u>et</u> <u>al.</u>,     :
                                    :
                    Defendants.     :
_____:

<u>**WOLFSON**</u>, **United States District Judge:**

Presently before the Court is a motion for summary judgment by defendants, the

Township of Hamilton, the Hamilton Police Department (collectively the "Municipal

Defendants") and Officer Robert Bilobran ("Bilobran"), with respect to the 42 U.S.C. § 1983

claims of Plaintiff Louis Ference ("Plaintiff" or "Mr. Ference").[1] This action arises out of the

actions allegedly taken by Bilobran and other police officers after the breakout of an argument in

_____

[1]Although the Complaint also designates Plaintiff's wife, Ann Marie Ference, as a plaintiff,  no
allegations in any of the section 1983 claims in the Complaint refer to conduct directed at her.
Instead, the Complaint alleges that she has suffered emotional damages and the loss of services
of consortium from her husband. Mrs. Ference simply alleges in broad brush fashion that she is
entitled to these damages pursuant to section 1983. But "[n]otwithstanding its broad language
section 1983 does not create substantive rights; rather it merely provides a remedy for
deprivations of rights established elsewhere in the Constitution or federal laws." <u>Estate of Smith</u>
<u>v. Marasco</u>, 318 F.3d 497, 505 (3d Cir. 2003) (citation omitted). Because Mrs. Ference has not
alleged any such violation, and the record provides no evidence to support her allegations of
damages, all defendants are entitled to summary judgment on her section 1983 claims.
        Additionally, though the Complaint alleges the involvement of various John Does in the
violation of Plaintiff's rights, discovery has ended and Plaintiff has not identified additional
defendants. Thus, Plaintiff's claims against the various John Does are dismissed.

the lobby of the Hamilton Township police station over the relinquishment of Plaintiff's

granddaughter, T.A.F., from her paternal grandparents to her mother, Alicia Tazza ("Tazza").

Plaintiff's section 1983 claims are based on malicious prosecution, retaliatory prosecution, abuse

of process, false arrest, false imprisonment and excessive force.

For the following reasons, the Municipal Defendants are entitled to summary judgment

on all of Plaintiff's claims. Further, Bilobran is entitled to summary judgment on all of

Plaintiff's claims except his section 1983 claim of excessive force.

**I. Construing the Record for Purposes of Evaluating Defendants' Motions**

Since defendants move for summary judgment, the Court will construe the record in the

light most favorable to Plaintiff.[2] Green v. New Jersey State Police, 246 Fed. Appx. 158, 159 (3d

Cir. 2007). The incident at issue in this case was the subject of proceedings before the Hamilton

Township Municipal Court, and thus testimony given before that court and its findings are an

important part of the record.[3] Further, a videotape of the incident was used in the municipal court

---

[2] Bilobran urges that, because Plaintiff submitted his own statement of facts rather than
specifically admitting or denying the facts alleged by Bilobran, Bilobran's statement of facts
should be deemed admitted. This is not the law. First, Local Rule 56.1 does not require that
Plaintiff admit or deny each allegation in Bilobran's statement of facts. Second, in the case on
which Bilobran relies, Longoria v. New Jersey, 168 F. Supp. 2d 308, 312 n.1 (D.N.J. 2001)
(citation omitted), the plaintiff had not filed a statement of facts whereas Mr. Ference has, and in
any event, the court there merely said that "I shall treat facts appearing in the Defendant's Rule
56.1 statement as admitted by [plaintiff], unless disputed by him in his briefs or contradicted by
the evidence." Longoria, 168 F.Supp. 2d at 312. n. 1 (emphasis added and citations omitted).

[3] Plaintiff suggests various reasons why Plaintiff's conviction under section 86-3 of the Hamilton
Code should not be considered by the Court, referring to the res judicata effect of municipal
court trials, and the New Jersey Rules of Evidence and Federal Rules of Evidence. However,
Plaintiff himself admits that he was convicted of violating the ordinance. Adezio Certification,
Exhibit A, 69:17-19. Moreover, Plaintiff relies on the record of the municipal court trial in the
statement of facts in his brief. Plaintiff cannot rely on that record and then claim that the findings
made by the Municipal Court Judge, including his conviction, are inadmissible in this Court.
Finally, as explained below, the Supreme Court's decision in Heck v. Humphrey, 512 U.S. 477

2

trial, and the video is repeatedly referenced in the trial transcripts submitted by Plaintiff. See Krasny Certification, Exhibits A-D. Indeed, Plaintiff argues that "with a video tape of the incident available . . . the facts in dispute can be judged by the jury." Plaintiff's Opposition Brief, 14. The videotape is also likely the best available evidence of the events at issue in this case. Thus, the videotape will be considered as part of the record.[4]

The above requires the Court to make two caveats to the usual rule that, on a summary judgment motion, the Court must construe the record in the light most favorable to the non-moving party. First, the Court will not draw inferences in Plaintiff's favor that are inconsistent with the events depicted in the videotape of the incident. See Scott v. Harris, 127 S.Ct. 1769, 1776 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment . . . [and thus,] the Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape").

Second, in accordance with Heck v. Humphrey, 512 U.S. 477 (1994), the Court will not draw inferences in Plaintiff's favor that would necessarily negate the municipal court's judgment that Plaintiff was guilty of violating section 86-3 of the Hamilton Code. The Court will draw inferences in Plaintiff's favor only insofar as they do not undermine the basis of the municipal court's findings. Plaintiff argues that Heck should not apply and that the Court should not

_____

(1994), governs the effect of prior convictions on section 1983 claims, and requires the Court to consider Plaintiff's conviction.

[4]On December 18, 2007, the Court notified all parties that the video was being considered, and offered to make it available to any party who desired to view it. No party acted on the Court's invitation to view the video or challenged the authenticity of the video.

consider the municipal judgment against him based on the doctrine of res judicata and limitations imposed by the Federal Rules of Evidence. However, the Court must consider Plaintiff's conviction in accordance with the Third Circuit's interpretation of Heck in Gilles v. Davis, 427 F.3d 197 (3d Cir. 2005). In Gilles, the court affirmed the principle that "[u]nder Heck, a § 1983 action that impugns the validity of the plaintiff's underlying conviction cannot be maintained unless the conviction has been reversed on direct appeal or impaired by collateral proceedings." Gilles, 427 F.3d at 209. The court recognized "that concurring and dissenting opinions in Spencer v. Kemna, 523 U.S. 1 (1998), question the applicability of Heck to an individual, such as [plaintiff], who has no recourse under the habeas statute." Id. at 209-10 (citations omitted). Notwithstanding the fact that the plaintiff had no recourse under habeas corpus, the court concluded that "these opinions do not affect our conclusion that Heck applies to [plaintiff's] claims." Id. at 210. I note, however, that other circuits are not in accord. See, e.g., Powers v. Hamilton County Defender Com'n, 501 F.3d 592, 603 (6th Cir. 2007) ("We are persuaded by the logic of those circuits that have held that Heck's favorable-termination requirement cannot be imposed against § 1983 plaintiffs who lack a habeas option for the vindication of their federal rights").

As explained below, Plaintiff was convicted of violating a municipal ordinance of the Township of Hamilton and assessed a minimal fine and court costs. Adezio Certification, Exhibit D. He did not appeal his conviction. Adezio Certification, Exhibit A, 70:1-2. Similar to the plaintiff in Gilles, who entered into Pennsylvania's Accelerated Rehabilitative Disposition program, whereby, after a probationary period his conviction was expunged, Plaintiff here had no recourse to habeas corpus; there was no detention to contest. Nonetheless, pursuant to Gilles, Heck still applies to Plaintiff's section 1983 claims.

4

Further, the fact that Plaintiff was found guilty of violating a municipal ordinance does not affect the analysis under Heck. First, under New Jersey law, "prosecutions for violations of municipal ordinances are criminal in nature." State v. DeAngelo, 396 N.J. Super. 23, 40 (App. Div. 2007) (citation omitted); see also State, Tp. Of Pennsauken v. Schad, 160 N.J. 156, 171 (1999) ("[M]unicipal court proceedings to prosecute violations of ordinances are essentially criminal in nature") (citation omitted). Moreover, to find Plaintiff guilty, the municipal court was required to find beyond a reasonable doubt that Plaintiff violated section 86-3. Krasny Certification, Exhibit D, 60 ("[T]here must be a proof beyond a reasonable doubt [,] these are criminal matters, and therefore, any lesser standard of proof provided by the State should and would result in an acquittal on the charges pending"). Further, a court in this district has recently applied Heck to bar a constitutional claim based on a conviction of a New Jersey disorderly persons offense, which, like a conviction for a municipal ordinance violation, is not a "crime" within the meaning of the New Jersey Constitution. N.J.S.A. 2C:1-4.a. In Garrison v. Porch, Docket No. 04-1114, 2007 WL 776799, * 3 n. 4 (D.N.J. Mar. 9, 2007), the court explained: "[Plaintiff] argues that Heck does not bar his constitutional claims because his guilty pleas were for disorderly persons offenses, which are not 'crimes' in the State of New Jersey. (Pl.'s Br. at 5-6.) [Plaintiff's] argument is untenable. The Third Circuit has held that pleading guilty to a disorderly persons conduct charge is sufficient to bar a subsequent § 1983 claim." (citing Gilles, 427 F.3d at 209 n. 8.) Thus, by analogy, Heck's rule, that a section 1983 claim that would necessarily impugn an underlying conviction will be barred unless there is "termination of the prior criminal proceeding in favor of the accused," Gilles, 427 F.3d at 210 (quoting Heck, 512 U.S. at 485), applies to Plaintiff's conviction for violating a municipal ordinance.

Second, the purposes that the Gilles court describes as underpinning Heck, "to avoid

parallel litigation of probable cause and guilt" and to prevent "the claimant from succeeding in a tort action after having been convicted in the underlying criminal prosecution, which would run counter to the judicial policy against creating two conflicting resolutions arising from the same transaction," are applicable here. Id. at 209 (citing Heck, 512 U.S. at 484). If Heck did not apply to the case at bar, the Court would have to essentially retry the charge against Plaintiff for violating section 86-3 of the Hamilton Code in the course of evaluating his section 1983 claims.

Third, although they did not specifically discuss the matter, other federal courts, assessing its applicability, have applied Heck to section 1983 claims that would impugn the validity of a conviction under a municipal ordinance. See Swiecicki v. Delgado, 463 F.3d 489, 495 (6th Cir. 2006) (applying the Heck rule for tolling the statute of limitations where plaintiff was convicted of violating the Cleveland Codified Ordinance, and stating "if [plaintiff] had brought his excessive-force claim before such reversal [of his conviction], the district court would have had to dismiss it as Heck-barred")[5] (citing Heck); Cordova v. City of Reno, 920 F.Supp. 135, 137 (D. Nev. 1996) (plaintiff's section 1983 claim barred by Heck because it would "necessarily imply the invalidity of [plaintiff's] conviction under th[e] ordinance"); Acevedo v. City of O'Fallon, Docket No. 07-859, 2007 WL 1541881, *3 (E.D. Mo. May 24, 2007) (applying Heck to bar plaintiff's claims based upon violations of a municipal ordinance).

Thus, while resolving all factual disputes in favor of Plaintiff, the Court will not draw inferences that contradict the events depicted in the video of the incident or, pursuant to Heck,

---

[5]I note that the Swiecicki court's analysis may no longer be good law after the Supreme Court's decision in Wallace v. Kato, 127 S.Ct., 1091 (2007), which explained the relationship of Heck to the statute of limitations in a section 1983 claim. But that does not change the fact that, in Swiecicki, the court found Heck applicable in the context of an ordinance conviction, and that application of Heck has not been drawn into question.

the basis of Plaintiff's conviction in municipal court.

## II. Factual Background

Plaintiff's claims arise out of an incident on December 29, 2003, at the Hamilton
Township Police Department, where Plaintiff had arranged to deliver T.A.F. to Tazza, following
weekend visitation. Because some of Plaintiff's claims are very fact specific and must be
considered in light of the totality of the circumstances, it is necessary to explain the incident at
the police station in detail. When considering the facts of this case, it should be noted that the
incident took place very quickly; less than a minute passed between the time Plaintiff entered the
lobby and the time he was arrested. Krasny Certification, Exhibit D, 72.

Due to the strained nature of the relationship between Plaintiff's son, the father of
Plaintiff's granddaughter, and Tazza, Plaintiff was used to effectuate communication between
T.A.F.'s parents with respect to child visitation issues. Adezio Certification, Exhibit A, 23: 14-
17. Plaintiff alleges that he had reached an agreement with Tazza that his family would keep
T.A.F. through the weekend until the night of Monday, December 29, 2003. Over the course of
the weekend, two disputes developed between Plaintiff's family and Tazza. First, there was a
dispute between Plaintiff's son and Tazza over the payment of medical expenses. Id. at 24:1-9.
Second, and more importantly, there was a dispute regarding the entitlement of Plaintiff and his
family to keep T.A.F. through Monday. Krasny Certification, Exhibit D, 66-67. During the
afternoon of December 29, Plaintiff claims that he left a message with the boyfriend of Tazza's
mother, indicating that Plaintiff would deliver T.A.F. to the Hamilton police station that night at
seven.  Plaintiff received a call from the Hamilton police department around five-thirty or six,
asking if Plaintiff could drop off T.A.F. earlier, but Plaintiff explained that by the time T.A.F.
was packed up, they could not get there before seven. Adezio Certification, Exhibit A, 27:24-

28:17.

The upshot of these disputes follows. In the twenty four hours before Plaintiff was to bring T.A.F. to the police station, he had received three phone calls from the police and a call from Tazza accusing him of lying to the police about his entitlement to keep T.A.F. through the weekend. Krasny Certification, Exhibit D, 66. The Honorable Louis Sancinito, J.M.C., of the Hamilton Township Municipal Court found that Tazza "was making phone calls for the better part of 24 hours to the police [and] had already signed a complaint against Mr. Ference's son, a warrant complaint so a warrant had been issued for his son's arrest." Id. at 62. In short, when Plaintiff and his wife came to drop off T.A.F at the police station, as the municipal court indicated, "this was an emotionally charged evening." Id. Judge Sancinito also found that "Officer Bilobran got involved in the emotions that evening too, and I think in large part, as a result of the phone calls that were coming in and out, the fact that the Mrs. Tazzas were sitting there in the lobby for a significant period of time over this issue of custody." Id. at 63.

When Plaintiff and his wife entered the police station lobby with T.A.F., Tazza and her mother were already sitting in the lobby. Plaintiff started walking straight to the police desk where, presumably, he intended to drop off T.A.F. Tazza's mother came over and reached out to take T.A.F. away from Plaintiff, but Plaintiff just walked right by as if she were not there. Krasny Certification, Exhibit C, 114-15; Exhibit D, 69. The Municipal Court Judge found that "clearly, if simply the child was to be turned over or simply if the child was going to get a kiss goodbye, it could have been turned over to the grandmother at that point, and this incident would have been over." Krasny Certification, Exhibit D, 69. Next, Tazza got up, approached Plaintiff and reached for her daughter. In response, Plaintiff turned away with the child. The court found "that Mr. Ference, by his turning away, didn't intend to assault Ms. Tazza . . . I believe it was his

8

intent that he was going to make this presentation of the child at the police bubble [(police desk)], for what actual purpose I don't know." Id. at 70. Further: "I find that clearly he was going to do whatever was necessary to make this exchange as difficult as possible for her. If his intent had been any different, he would have simply handed over the child to the grandmother five seconds after he entered that police station lobby." Id. at 73.

At this point, Tazza complained to the officers behind the police desk, and the officers repeatedly directed Plaintiff to turn over his granddaughter to Tazza. The Municipal Court Judge indicated that Plaintiff did not comply with the officers' instructions to turn over the child for at least sixteen seconds: "There is a course of time then from the point where Ms. Tazza basically addresses the bubble asking for help . . . a period of 16 seconds, during which time the testimony from Officer Bilobran and the other officers, and I don't really believe it's much disputed, even by Mr. Ference, that there was some discussion going on in terms of [asking Mr. Ference to, '] turn over the child, turn over the child,['] where Mr. Ference was kind of responding as well. That's a period of . . . 16 seconds until Officer Bilobran actually leaves the bubble area and enters into the lobby area." Id. at 70-71. In his deposition, Plaintiff claims that "the police are telling me, ['get the hell out. Get out of this lobby. Get your ass out of here,'] and they are pointing. I handed the baby to my wife. I immediately turned around to leave." Adezio Certification, Exhibit A, 38:12-16. Plaintiff's wife handed the child to the Tazzas who immediately left down a hallway leading to an exit different from the one that Plaintiff had used to enter the lobby. Adezio Certification, Exhibit A, 38:17-22.

The municipal court only made findings of fact until this point.[6] Plaintiff was convicted

---

[6]The court specifically stated that no findings were being made with respect to the events that followed: "I make no specific findings as to the hands [of officer Bilobran] being placed on [Plaintiff] or fists being raised . . . and I really feel that that's simply a red herring at this point."

of violating Township Ordinance 86-3, titled "Interference with police officer." Adezio

Certification, Exhibit C. The ordinance states: "No person shall resist, obstruct or interfere with

any police officer of the township in the performance of his duty, nor shall any person disobey

the lawful and reasonable order or instructions of any such officer." Id.  In finding Plaintiff

guilty beyond a reasonable doubt, the court reasoned as follows:

> I don't find it appropriate in this case for Mr. Ference to have made a decision
> that I'm going to leave kind of when I want to leave, and I'm going to have my
> say and argue the situation, even if he believed that Officer Bilobran was coming
> from left field . . . And I find here very simply that Mr. Ference had a couple
> different opportunities to diffuse the situation . . . On the charge . . . filed by
> Officer Bilobran, I do find that Mr. Ference violated that ordinance of the
> Township [for failing to follow the reasonable and lawful directions of a police
> officer.] And I find that based very simply on the fact that he did have an
> opportunity. . . to diffuse the situation, to make the situation end. He had the
> control . . . He had the ability to terminate this problem by simply, one, turning
> over the child at any point in the course of, really, 30 seconds from the time he
> could have handed the child to the grandmother until Officer Bilobran actually
> exited the bubble area . . . Mr. Ference did not want to give up his chance to have
> kind of a final say before he did turn over the child, and it was only after his wife
> basically said give me the child that the situation ended and the Tazzas left.

Krasny Certification, Exhibit D, 71-75.

 After finally complying with the directions of the police, Plaintiff turned around and

walked toward the exit of the lobby. As he walked, he claims there was an officer screaming

behind him, "Get your ass out of here" and "You're moving too slow." Krasny Certification,

Exhibit C, 122-123. Within a couple of feet of the front door, Id. at 123, Plaintiff claims that he

was "forcibly shoved" from behind. Adezio Certification, Exhibit A, 40:9-11. Though Plaintiff

claims it was a two-handed shove right below his neckline, Id. at 41:8-13, the video of the

incident indicates that Bilobran used only one hand. Plaintiff claims that it "was a violent enough

---

Krasny Certification, Exhibit D, 74.

shove to push me through and into the glass of the door. You know, a couple of steps forward."
Krasny Certification, Exhibit C, 124-25.  Plaintiff contends that the shove caused his contact
lenses to roll back into his eyes, Id. at 125, and his outstretched hand touched the glass of the
door. Id.

Though the video does not indicate the force of the shove, it does indicate the
surrounding circumstances. At the time of 19:51:49, Bilobran came out from behind the front
desk with his finger indicating that Plaintiff should leave. Mrs. Ference was walking towards
Tazza and her mother with T.A.F. At 19:51:51, Bilobran was walking towards Plaintiff, with
Plaintiff turning around towards the exit. Mrs. Ference was in the process of handing T.A.F. over
to Tazza and her mother. At 19:51:53, Plaintiff had turned around and started walking toward the
exit. T.A.F. was in the arms of Tazza, and Tazza, her mother and Mrs. Ference were still in the
lobby. Finally, at 19:51:55, Bilobran shoved Plaintiff with one hand. While Mrs. Ference is still
in the lobby, Tazza and her mother are off screen, presumably having started walking down the
hallway to exit the police station. This sequence captures the last six seconds of Plaintiff's
standoff with Tazza and the police officers in the lobby. It clearly indicates that Bilobran shoved
Plaintiff when T.A.F. had been returned to Tazza for at most a few seconds. In short, it shows
that Plaintiff was shoved, not after, but during a disturbance in the police station lobby; a
disturbance the municipal court found to be caused by Plaintiff's failure to follow police
instructions.

After he was shoved, Plaintiff claims that he turned around and saw that it was Bilobran
who had shoved him. Adezio Certification, Exhibit A, 40:16-19. Then Bilobran "was trying to

11

get me to raise my fists. He had his fists in the air in a boxing stance."[7] Id. at 42:10-12. When Plaintiff asked Bilobran why he pushed Plaintiff, Bilobran allegedly responded that "[Plaintiff] was walking too F–ing slow." Id. at 43:4-7.

Next, with the assistance of another officer, Bilobran placed Plaintiff under arrest. The officers grabbed Plaintiff's arms and put them behind his back. Id. at 44:21-25; 45:1. Plaintiff claims that they "forcibly pushed me across the lobby. I mean, I was trying to walk, but they were like running with me with my hands behind my back to the door that goes into the back area of the police station." Id. at 43:15-19. They took Plaintiff back into the lobby where he claims they "ran [him] into the closed door face first."[8] Id. at 45:22-23. This is confirmed by Mrs. Ference. Krasny Certification, Exhibit D, 21. They twisted his arms to the point of causing severe pain in his left arm; it was shoved towards his head.[9] Krasny Certification, Exhibit C, 128. While his face was "scrunched into the door," Adezio Certification, Exhibit A, 46:3, the door to the holding room was opened. Plaintiff was then handcuffed to a bar in a backroom for what he estimates to be fifteen to twenty minutes before he was released. Id. at 47:17-19; 50:20-21.

---

[7]During the municipal court trial, Bilobran claimed that Plaintiff acted aggressively when he turned around: "He turned, he had clenched fists . . . To me, I took it as like an antagonistic type stance . . . So at that point I placed him under arrest." Krasny Certification, Exhibit A, 80-81.

[8]At the municipal trial, Plaintiff testified: "The door was closed and they ran me right into the door." Krasny Certification, Exhibit C, 127. When asked if this was "a shove again," Plaintiff responded, "Yeah . . . They jammed me into the closed door face first and then I don't know if one of them opened the door, I believe somebody from the inside opened the door, and they proceeded to bring me back." Id.

[9]The video shows Plaintiff pushed against the door or wall at 19:51:08-09, and though the video is unclear, it appears that Bilobran was involved in pushing Plaintiff against the wall. Plaintiff contends that both officers pushed him against the wall and twisted his arms. See Krasny Certification, Exhibit C, 127-28. At the municipal trial, Bilobran denied slamming Plaintiff against the wall, Krasny Certification, Exhibit A, 134, but nowhere in the record does he deny involvement in what the video depicts -- Plaintiff being pushed up against the wall with an uncertain degree of force.

Bilobran exited the holding room to speak to another officer, and when he returned, Plaintiff alleges Bilobran said something like the following: "I don't know what happened here tonight. Everything got out of hand . . . You have to realize that these women have been driving me nuts  . . . It wasn't handled properly but, you know, I want to apologize . . . you have every right to file charges if you think anything here was handled wrong." Id. at 49:21-25; 50:5-9.

After Plaintiff got in the car, he claims to have experienced chest pains and felt ill. Adezio Certification, Exhibit A, 51:3-5. His arm felt "like it was wrenched out of the socket." Id. at 52:15-17. Plaintiff went to the hospital, was given X-rays, was allegedly told that the prognosis was that he had "some soft tissue damage," and he "just took the hot compresses or Tylenol or whatever they recommended" for the pain. Id. at 53:6; 92:15-17. He did not stay overnight. Id. at 55:18.  He used heat wraps for the next week or so. Id. at 76:1-3.  Plaintiff provides no further evidence of physical injuries stemming from the incident and no documentation of his injuries.

Within a few days of the incident, Plaintiff claims that he contacted the Internal Affairs office of the police department to complain about the incident. Id. at 57:1-7. Plaintiff alleges that he received an envelope with a ticket and a summons that was postmarked on March 8, 2004, charging him with a violation of section 86-3 of the Hamilton Code, over two months after the incident. Krasny Certification, Exhibit C, 134. Bilobran claims that he wrote out and submitted the ticket for mailing within a few days of the incident. Krasny Certification, Exhibit A, 149. In any event, Plaintiff was mailed a court notice of the charge dated January 21, 2004. Adezio Certification attached to Municipal Defendants' Reply Brief, Exhibit A. Further, Plaintiff's defense counsel in the municipal court trial wrote a letter to the municipal prosecutor dated February 9, 2007, requesting a copy of the videotape. Id., Exhibit B. This indicates that Plaintiff

13

was aware of the charge before March 8, 2004.

## III. Procedural History

As a result of the above incident, Bilobran charged Plaintiff with violating Hamilton Township Ordinance 86-3. Adezio Certification, Exhibit C. Further, Tazza filed a complaint against Plaintiff, alleging that he had harassed her in violation of N.J.S.A. 2C:33-4B.[10] Adezio Certification, Exhibit B. On October 13, 2004, the municipal court found Plaintiff guilty of violating section 86-3 of the Hamilton Code and not guilty with respect to the charge of harassing Tazza. Krasny Certification, Exhibit D, 73-75.  Plaintiff did not appeal his conviction. Adezio Certification, Exhibit A, 70:1-2.

Plaintiff filed the present lawsuit on December 29, 2005. Discovery ended on December 29, 2006. Docket No. 7.

## IV. Discussion

### A. Plaintiff Withdraws His Claims Against the Municipal Defendants

In his opposition papers, Plaintiff withdraws all of his claims against the Municipal Defendants. First, he withdraws his claims against Hamilton Township Police Department since it is not a separate entity from the municipality. Plaintiff's Opposition Brief, 4. Second, Plaintiff concedes that he cannot establish municipal liability pursuant to Monell v. The Department of Social Services, 436 U.S. 658 (1978), by demonstrating either that Bilobran's actions were the result of a policy or custom of the town or that Bilobran has the requisite policy-making authority. Id. "[M]unicipal liability under § 1983 cannot be inferred from a single instance of

---

[10] N.J.S.A. 2C:33-4B. states: "[A] person commits a petty disorderly persons offense if, with purpose to harass another, he: . . . b. Subjects another to striking, kicking, shoving, or other offensive touching, or threatens to do so."

police misconduct by a non-policy making employee." <u>Brown v. City of Camden</u>, Docket No. 03-1303, 2006 WL 2177320, *9 (D.N.J. Jul. 27, 2006) (citation omitted). Third, Plaintiff concedes that he cannot establish municipal liability pursuant to a failure to train theory under <u>City of Canton, Ohio v. Harris</u>, 489 U.S. 378 (1989). Plaintiff's Opposition Brief, 4. Finally, Plaintiff concedes that the Township cannot be liable for the actions of Bilobran under a theory of <u>respondeat superior</u>. <u>Id.</u> Since Plaintiff does not provide any other basis for his claims of municipal liability,[11] the Municipal Defendants are entitled to summary judgment.[12] Thus, the Court turns to Plaintiff's remaining claims against Bilobran in his individual capacity.

**B. Standard of Review**

Summary judgment is appropriate where the Court is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 330 (1986).  A fact is "material" only if it might affect the outcome of the suit under the applicable rule of law. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. <u>Id.</u> The burden of establishing that no "genuine issue" exists is on the party moving for summary judgment. <u>Celotex</u>, 477 U.S. at 330. When the burden of proof at trial is on the non-moving party, as in the case at bar, the

---

[11]Despite these concessions, the Municipal Defendants still respond to Plaintiff's claim of malicious prosecution in their reply brief. Even putting aside the problem that "[w]hen a suit against a municipality is based on § 1983, the municipality may only be liable if the alleged constitutional transgression implements or executes a policy, regulation, or decision officially adopted by custom," <u>Skeens v. Shetter</u>, Docket No. 04-4474, 2006 WL 872287, *13 (D.N.J. Mar. 30, 2006) (citation omitted), Plaintiff's malicious prosecution claim against the Municipal Defendants fails for the same reasons it fails against Bilobran, which are discussed below.

[12]The Court declines to award attorney's fees to the Township based on these concessions, as Plaintiff's allegations were made prior to any discovery, and they were withdrawn on the first motion made by the Municipal Defendants.

moving party can satisfy its initial burden by submitting evidence that negates an essential element of the non-moving party's claim, or by demonstrating that the non-moving party's evidence is insufficient to establish an essential element of the non-movant's claim. <u>Id.</u> at 331. Once the moving party satisfies this initial burden, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). To do so, the non-moving party must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" <u>Celotex</u>, 477 U.S. at 324. In other words, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986); <u>see</u> <u>also</u> <u>Ridgewood Bd. of Ed. v. Stokley</u>, 172 F.3d 238, 252 (3d Cir.1999). A genuine issue of material fact is one that will permit a reasonable jury to return a verdict for the non-moving party. <u>Anderson</u>, 477 U.S. at 248. In evaluating the evidence, a court must "view the inferences to be drawn from the underlying facts in the light most favorable to the [non-moving] party." <u>Curley v. Klem</u>, 298 F.3d 271, 276-77 (3d Cir. 2002) (citation omitted).

**C. Retaliatory Prosecution and Abuse of Process**

In his briefing (but <u>not</u> his Complaint), Plaintiff claims that Bilobran filed the criminal complaint against Plaintiff in retaliation for Plaintiff's complaints to Internal Affairs and the County Prosecutors Office, thereby violating the First Amendment. The date the complaint was issued against Plaintiff is unclear from the record. In any event, Plaintiff also contends that its service upon him over two months later (even though he may have already received a court notice, and clearly had a lawyer contact the municipal prosecutor on his behalf on February 9, 2007) was inappropriate. Plaintiff's Opposition Brief, 12. But even if the complaint was issued

16

after Plaintiff complained to Internal Affairs, Plaintiff's claim of retaliatory prosecution fails as a matter of law.

> The elements of a claim of retaliatory prosecution are as follows:
>
> In order to establish a retaliation claim under the First Amendment, a plaintiff must prove: (1) conduct or speech protected by the First Amendment; (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising his First Amendment rights; and (3) a causal link between the constitutionally protected conduct or speech and the retaliatory action. Thomas v. Independence Twp., 463 F.3d 285, 296 (2006); see also, e.g., Eichenlaub v. Twp. of Indiana, 385 F.3d 274, 282 (3d Cir. 2004); Rauser v. Horn, 241 F.3d 330, 333 (3d Cir. 2001). Because [plaintiff's] First Amendment claim is brought under a retaliatory-prosecution theory, it is subject to an additional requirement, that he allege and prove that the defendants' pursuit of the underlying criminal charge was unsupported by probable cause. Hartman v. Moore, 547 U.S. 250, 126 S. Ct. 1695, 1699, 1707, 164 L. Ed. 2d 441 (2006).

Albert v. Weaver, Docket No. 05-2380, 2007 U.S. Dist. LEXIS 59817, * 18-19 (M.D.Pa. Aug. 15, 2007). [3][1]

 Given that the municipal court found Plaintiff guilty beyond a reasonable doubt of violating section 86-3 of the Hamilton Code in front of Bilobran (indeed for failing to comply with his instructions),[14] this Court finds as a matter of law that Bilobran had probable cause to charge Plaintiff with violating section 86-3. Thus, Bilobran is entitled to summary judgment on this claim.

Plaintiff also brings a section 1983 abuse of process claim against Bilobran.  "The

---

[13] The Court notes that the court in Albert, following the Sixth and Eighth Circuits, extended the Supreme Court's ruling in Hartman to instances where, unlike the case at bar, there is no intervention of a third party prosecutor. See Albert, 2007 U.S. Dist. LEXIS 59817 at *22-23.

[14] After pulling away from Tazza with T.A.F. in his arms, Plaintiff testified in the municipal trial that "an officer that I know now to be Officer Bilobran, says . . . he didn't just say, he screamed at me . . . 'What are you doing? Give her that g.d. baby.'" Krasny Certification, Exhibit C, 118. Further, after Plaintiff responded, Bilobran allegedly stated, "Give her that baby and get the hell out of here." Id. at 120.

17

gravamen of that tort is not the wrongfulness of the prosecution, but some extortionate

perversion of lawfully initiated process to illegitimate ends." <u>Heck</u>, 512 U.S. at 486 n. 5. Further:

> "'[A] section 1983 claim for malicious abuse of process lies where prosecution is
> initiated legitimately and thereafter is used for a purpose other than that intended
> by the law.'" <u>Williams v. Fedor</u>, 69 F.Supp.2d 649, 673 (M.D.Pa.1999), aff'd
> mem., 211 F.3d 1263 (3d Cir. 2000). The crux of this action is the perversion of
> the legal process to achieve an objective other than its intended purpose. <u>Id.</u>
> "'When process is used to effect an extortionate demand, or to cause the surrender
> of a legal right, or is used in any other way not so intended by proper use of the
> process, a cause of action for abuse of process can be maintained.'" <u>Id.</u> (quoting
> <u>Brown v. Johnston</u>, 675 F.Supp. 287, 290 (W.D.Pa.1987)). To establish such a
> claim, "there must be some proof of a 'definite act or threat not authorized by the
> process, or aimed at an objective not legitimate in the use of [the] process.'" <u>Id.</u>
> (quoting <u>Feldman v. Trust Co. Bank</u>, No. Civ. A. 93-1260, 1993 WL 300136, at
> *4 (E.D.Pa. Aug. 2, 1993)).

<u>Golya v. Golya</u>, Docket No. 05-0100, 2007 WL 2301085, *7 (M.D.Pa. Aug. 9, 2007).

Other than Plaintiff's claim that Bilobran engaged in an act of retaliatory prosecution,

which fails for the reasons given above, Plaintiff has made no allegations that Bilobran acted

with a purpose that was in any way extortionate or otherwise inappropriate. Thus, Bilobran is

entitled to summary judgment on Plaintiff's section 1983 claim of abuse of process.

**D. Qualified Immunity Defense to Claims of Malicious Prosecution, False Arrest, False
Imprisonment and Excessive Force**

**1. Qualified Immunity Standard**

Bilobran asserts that he is entitled to qualified immunity on Plaintiff's section 1983

claims of malicious prosecution, false arrest, false imprisonment and excessive force. The Third

Circuit has recently explained the legal framework for evaluating claims of qualified immunity:

> When an officer's actions give rise to a § 1983 claim, the privilege of qualified
> immunity, in certain circumstances, can serve as shield from suit. The primary
> purpose of affording public officials qualified immunity, thus insulating them
> from suit, is to protect them "from undue inference with their duties and from
> potentially disabling threats of liability." The privilege of qualified immunity,
> however, can be overcome when state officials violate "clearly established

statutory or constitutional rights of which a reasonable person would have known."

Wright v. City of Phildelphia, 409 F.3d 595, 599-600 (3d Cir. 2005) (citations omitted).

The Supreme Court has set forth the analytical framework for determining when the privilege of qualified immunity has been overcome:

> A court required to rule upon the qualified immunity issue must consider, then, this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? This must be the initial inquiry . . . If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established.

Saucier v. Katz, 533 U.S. 194, 201 (2001).

The second step requires further elaboration. "To be clearly established for purposes of the qualified immunity analysis, the contours of the right must be sufficiently clear such that a reasonable official would understand that what he is doing violates that right." Hughes v. Shestakov, Docket No. 00-6054, 2002 WL 1742666, *4 (E.D.Pa. Jul. 22, 2002) (citing Karnes v. Skrutski, 62 F.3d 485, 492 (3d Cir. 1995)). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier, 533 U.S. at 202 (citation omitted). The analysis of whether a right was "clearly established" "'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" Curley v. Klem, 499 F.3d 199, 207 (3d Cir. 2007) (quoting Saucier, 533 U.S. at 201).

Thus, qualified immunity gives a police officer room to make a reasonable mistake about the legality of his or her actions: "The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct. It is

19

sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts. An officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances. If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense." Saucier, 533 U.S. at 205. In other words, "qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." Id. at 202 (citation omitted).

Finally, because Bilobran moves for summary judgment and "we are reviewing a claim of qualified immunity, we view the factual allegations in the light most favorable to [Plaintiff], the party claiming injury." Wright, 409 F.3d at 597 n.1 (citation omitted).

## 2. Malicious Prosecution

Bilobran argues that he is entitled to qualified immunity with respect to Plaintiff's section 1983 malicious prosecution claim. Specifically, Bilobran contends that Plaintiff's claim is barred because the Hamilton Township Municipal Court found Plaintiff guilty of violating section 86-3 of the Hamilton Code when he failed to follow Bilobran's instructions, namely, to hand over T.A.F and leave the police station, and Plaintiff did not appeal his conviction. The Court agrees.

The law in the Third Circuit is clear: "We read Heck to mean that if a section 1983 plaintiff seeks to recover damages for an unconstitutional conviction, imprisonment, or other harm caused by actions whose unlawfulness would render the conviction or sentence unlawful, the plaintiff must prove that the conviction or sentence has been reversed, expunged, or declared invalid." Torres v. McLaughlin, 163 F.3d 169, 173 (3d Cir. 1998). The pertinent "action" at issue is Bilobran's alleged malicious prosecution of Plaintiff by filing a criminal complaint against him. Its "unlawfulness would render [Plaintiff's] conviction . . . unlawful" because an element of

20

malicious prosecution is the termination of the prior criminal proceeding in favor of the accused. Plaintiff concedes that the case law supports this proposition, Plaintiff's Opposition Brief, 9, and he is correct: "To prevail in a Section 1983 [] malicious prosecution action, a plaintiff must show: (1) the defendants initiated a criminal proceeding; (2) the criminal proceeding ended in the plaintiff's favor; (3) the proceeding was initiated without probable cause; (4) the defendants acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered a deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding." Dibella v. Borough of Beachwood, 407 F.3d 599, 601 (3d Cir. 2005) (emphasis added and citation omitted). Plaintiff argues that the broad language of section 1983 should trump this case law, but the Third Circuit has also made clear that "[n]otwithstanding its broad language section 1983 does not create substantive rights; rather it merely provides a remedy for deprivations of rights established elsewhere in the constitution or federal laws." Marasco, 318 F.3d at 505 (citation omitted). Because Plaintiff's malicious prosecution claim requires the negation of his prior conviction, it is barred by Heck. Thus, Bilobran has demonstrated that Plaintiff cannot fulfill one of the elements of Plaintiff's section 1983 malicious prosecution claim as a matter of law, and Bilobran is entitled to qualified immunity on that claim.

**3. False Arrest and False Imprisonment**

"An arrest made without probable cause creates a cause of action for false arrest under 42 U.S.C. § 1983. In addition, 'where the police lack probable cause to make an arrest, the arrestee has a claim under § 1983 for false imprisonment based on a detention pursuant to that arrest.'" O'Conner v. City of Philadelphia, 233 Fed.Appx. 161, 164 (3d Cir. 2007) (citations omitted). See also Luthe v. The City of Cape May, 49 F.Supp.2d 380, 390 (D.N.J. 1999) ("[A]n arrest

21

based on probable cause can[not] become the source of a claim for false imprisonment")
(citation omitted). "An arrest was made with probable cause if 'at the moment the arrest was
made  . . . the facts and circumstances within [the officers'] knowledge and of which they had
reasonably trustworthy information were sufficient to warrant a prudent man in believing that
[the suspect] had committed or was committing an offense. In other words, the constitutional
validity of the arrest does not depend on whether the suspect actually committed any crime."
Wright, 409 F.3d at 602 (3d Cir. 2005) (citations omitted).

　　　　Plaintiff argues not merely that Bilobran lacked probable cause to arrest him, but also
that, even if he did violate section 86-3 of the Hamilton Code, his arrest for that offense was
unlawful under New Jersey state law. Plaintiff's Opposition Brief, 6. Thus, Plaintiff's section
1983 false arrest claim poses two distinct issues: first, whether Bilobran had probable cause to
believe that Plaintiff committed an offense under the Hamilton Township Code; and second, if
so, whether Bilobran violated the Fourth Amendment by arresting Plaintiff for that offense.

　　　　Any contention that Bilobran lacked probable cause to believe that Plaintiff committed
an offense is foreclosed by Heck.[15] Again, Plaintiff was convicted of violating section 86-3 of
the Hamilton Code for disobeying the lawful and reasonable orders of a police officer. Auerbach
Certification, Exhibits D and E. Plaintiff received orders from Bilobran and other police officers

---

[15]The Court is aware that in Montgomery v. De Simone, 159 F.3d 120, 126 (3d Cir.
1998), the Third Circuit stated that "[b]ecause a conviction and sentence may be upheld even in
the absence of probable cause for the initial stop and arrest, we find [plaintiff's] claims for false
arrest and false imprisonment are not the type of claims contemplated by the Court in Heck
which necessarily implicate the validity of a conviction or sentence." (citation omitted).
However, the Third Circuit has subsequently acknowledged that some false arrest claims, like
the one in the case at bar, cannot succeed without undermining the basis of a prior conviction:
"success on his § 1983 claim for false arrest would 'necessarily imply' that he was improperly
convicted." Gibson v. Superintendent of NJ Dept. of Law and Public Safety, 411 F.3d 427, 452
(3d Cir. 2005).

to hand over his granddaughter to Tazza, and the municipal court found beyond a reasonable doubt that he disobeyed these orders. Krasny Certification, Exhibit D, 70-72, 74. Because Bilobran witnessed Plaintiff's conduct, which the municipal court found to violate section 86-3, the Court finds as a matter of law that Bilobran had probable cause to believe Plaintiff violated section 86-3. Plaintiff cannot argue otherwise without negating his conviction.

The next issue, then, is whether Bilobran violated the Fourth Amendment when he arrested Plaintiff for conduct that (this Court must accept pursuant to Heck) violated section 86-3. Plaintiff argues that Bilobran exceeded the authority of a police officer to effect an arrest without a warrant pursuant to N.J.S.A. 40A:14-152, which provides: "[t]he members and officers of a police department and force, within the territorial limits of the municipality, shall have all the powers of peace officers and upon view may apprehend and arrest any disorderly person or any person committing a breach of the peace." There is no question that Plaintiff's conduct was "upon view" of the officer in question, so the issue is whether Plaintiff's conduct gave Bilobran probable cause to conclude that he was (1) a "disorderly person" or (2) someone "committing a breach of the peace" within the meaning of the statute.

"Disorderly persons offenses are only those offenses which are so defined in the New Jersey Criminal Code or other statutes. N.J.S.A. 2C:1-4. Violation of a municipal ordinance is not a disorderly persons offense." Marion v. Borough of Manasquan, 231 N.J.Super 320, 330 (App. Div. 1989). N.J.S.A. 2C:1-4.b. defines disorderly persons offenses as follows: "An offense is a disorderly persons offense if it is so designated in this code or in a statute other than this code. An offense is a petty disorderly persons offense if it is so designated in this code or in a statute other than this code." Further, N.J.S.A. 2C:1-4.c. reads: "Insofar as any provision outside the code declares an offense to be a misdemeanor when such offense specifically provides a

23

maximum penalty of 6 months imprisonment or less, whether or not in combination with a fine, such provision shall constitute a disorderly persons offense." Plaintiff  was convicted of violating section 86-3 of the Hamilton Code. Nothing in the Hamilton Code indicates that this is a disorderly persons offense. Further, the Hamilton Code does not indicate that section 86-3 is a "misdemeanor" that "provides a maximum penalty of 6 months imprisonment or less." Thus, Plaintiff was convicted of a violation of a municipal ordinance which does not constitute a disorderly persons offense under New Jersey law.

"[W]ith respect to disorderly persons offenses, see N.J.S.A. 2C:1-4b, the common law requirement of 'breach of the peace' is not a precondition to an arrest without a warrant under N.J.S.A. 40A:14-152. However, with respect to other offenses, the requirement of a 'breach of the peace' remains in effect." State v. Hurtado, 219 N.J. Super. 12, 24 (App. Div. 1987) (Skillman, J.A.D. dissenting), rev'd on dissent, 113 N.J. 1, 1 (1988) ("The judgment of the Appellate Division is reversed . . . substantially for the reasons expressed in the dissenting opinion of Judge Skillman"). Subsequent case law has clarified this statement of the law: The "arresting power is not confined or limited to only a disorderly persons offense. That specific phrase is absent from the statute's wording. Rather the arresting power is directed towards any person who is disorderly or as the language specifically says 'any disorderly person.'" State v. Vonderfecht, 284 N.J. Super. 555, 558 (App. Div. 1995) (emphasis in original). Thus, in Vonderfecht, the defendant's arrest for the petty disorderly persons offense of defiant trespass was lawful. Id. at 558; see also State v. Dangerfield, 171 N.J. 446, 460 (N.J. 2002) ("Accordingly, we do not disturb the authority of the police to arrest for disorderly and petty disorderly persons offenses that occurred in their presence").

Thus, even if Plaintiff did not commit a disorderly persons offense, his arrest was lawful

24

under N.J.S.A. 40A:14-152 if Bilobran had probable cause to believe he was a "disorderly person" or creating a "breach of the peace." The Court finds as a matter of law that Plaintiff's conduct, when construed in the light most favorable to Plaintiff, and in a manner consistent with his conviction pursuant to Heck, supports such a finding.

Given that Plaintiff was found beyond a reasonable doubt to have violated section 86-3 of the Hamilton Code, it is beyond cavil that he was disobeying the lawful and reasonable orders of a police officer. Moreover, he was doing so in the volatile context of a custody dispute in the middle of a police station: Tazza had attempted to take the child from Plaintiff's arms; there was argument back and forth; the municipal court found that Plaintiff ignored police officers' instructions to hand over the child for a period of at least sixteen seconds, Krasny Certification, Exhibit D, 70-71; and further, that "he was going to do whatever was necessary to make this exchange as difficult as possible for [Tazza]." Id. at 73. This is sufficient for Bilobran to have reasonably believed that Plaintiff's actions constituted a breach of the peace, or at least made him a disorderly person. "Failure, even though conscientious, to obey directions of a police officer, not exceeding his authority, may interfere with the public order and lead to a breach of the peace." State v. Lashinsky, 81 N.J. 1, 11-12 (1979) (citations omitted); People v. Galpern, 259 N.Y. 279, 282 (1932). Plaintiff's conduct is clearly a greater interference with public order than the conduct at issue in Plaintiff's example of an unlawful arrest in Marion, 231 N.J. Super. at 324 (unlawful arrest for a violation of an ordinance which "apparently requires people who are on the beach walk[ing] in 'bathing attire' to purchase a beach badge"); see also Hurtado, 219 N.J. Super. at 25 (unlawful arrest for violation of a municipal ordinance that prohibits littering). Accordingly, because the Court finds that Bilobran had statutory authority to arrest Plaintiff, as well as probable cause to believe that Plaintiff committed an offense, his claims of false arrest

and false imprisonment fail as a matter of law. Bilobran is entitled to qualified immunity on those claims.

Even assuming <u>arguendo</u>, that Plaintiff's arrest was unlawful under New Jersey law, it does not follow that the arrest violated the Fourth Amendment. "If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." <u>Atwater v. City of Lago Vista</u>, 532 U.S. 318, 354 (2001). "[T]he standard of probable cause applie[s] to all arrests, without the need to 'balance' the interests and circumstances involved in particular situations." <u>Id.</u> (citation omitted); <u>see also</u> <u>Christopher v. Nestlerode</u>, 373 F.Supp. 2d 503, 518 (M.D.Pa. 2005) (the "'reasonableness' of a seizure, when based on individualized suspicion, is judged without reference to the authority of officials to effect an arrest under state law") (citing <u>Atwater</u>, 532 U.S. at 347). Thus, there is case law that strongly suggests that Plaintiff's arrest, even if unlawful under state law, would not violate the Fourth Amendment.

The Court is aware, however, that <u>Atwater</u> could potentially be distinguished. The arrest of the plaintiff in <u>Atwater</u> was clearly permissible under state law, <u>Atwater</u>, 532 U.S. at 323, whereas the Court is here assuming Plaintiff's arrest was unlawful under state law. Such a distinction could be supported by the Third Circuit's dicta that "[t]o determine whether an arrest is valid, we look to the law of the state where the arrest took place." <u>Wright</u>, 409 F.3d at 601. Without reaching the issue -- whether <u>Atwater</u> applies to an arrest that is unlawful under state law -- the Court finds that even if Plaintiff's arrest is illegal under state law, that is not material to the "essential interest in readily administrable rules" that drove the <u>Atwater</u> decision. <u>Atwater</u>, 532 U.S. at 347.  "Often enough, the Fourth Amendment has to be applied on the spur (and in the heat) of the moment, and the object in implementing its command of reasonableness is to

26

draw standards sufficiently clear and simple to be applied with a fair prospect of surviving judicial second-guessing months and years after an arrest or search is made." Id. Here, whether the requirements of N.J.S.A. 40A:14-152 are met, that is, whether someone is acting like a disorderly person or causing a breach of the peace, is not a "clear and simple" line to draw. To make section 1983 false arrest claims turn on the validity of an arrest under state law, at least in the case of N.J.S.A. 40A:14-152, might be beset with the administrability concerns the Supreme Court cited when adopting the bright line rule in Atwater. Whatever the merits of a potential argument distinguishing Atwater, such an argument is certainly not "clearly established" law. Thus, even if Plaintiff's arrest were illegal under state law, Bilobran would be entitled to qualified immunity on the second step of the qualified immunity analysis.

Atwater indicates, however, that Plaintiff could still have a claim if his arrest was "'conducted in an extraordinary manner, unusually harmful to [his] privacy or even physical interests.'" Atwater, 532 U.S. at 353 (quoting Whren v. United States, 517 U.S. 806, 818 (1996)). The Court will address this issue in the context of Plaintiff's excessive force claim.

**4. Excessive Force**

**a. Qualified Immunity Defense: Step One**

Plaintiff's excessive force claim must be evaluated under the Fourth Amendment standard of objective reasonableness, without regard to underlying motivation. See Graham v. Connor, 490 U.S. 386, 395-97 (1989). This requires "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. at 396 (citation omitted). "Other relevant factors include the possibility that the persons subject to the police action are

27

themselves violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time." Sharrar v. Felsing, 128 F.3d 810, 822 (3d Cir. 1997). Importantly, the Third Circuit rejects the proposition that "the absence of physical injury necessarily signifies that the force has not been excessive, although the fact that the physical force applied was of such an extent as to lead to injury is indeed a relevant factor to be considered as part of the totality." Id. (citation omitted). In evaluating excessive force claims, courts must adopt an officer's "on the scene" perspective:

> The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight . . . 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments- in circumstances that are tense, uncertain, and rapidly evolving- about the amount of force that is necessary in a particular situation.

Graham, 490 U.S. at 396-97 (citations omitted).

Finally, "[t]he reasonableness of the use of force is normally an issue for the jury." Rivas v. City of Passaic, 365 F.3d 181, 198 (3d Cir. 2004). "[A] police officer who is accused of having used excessive force is not 'precluded from arguing that he reasonably perceived the facts to be different from those alleged by the plaintiff,' but that 'contention . . . must be considered at trial.'" Id. at 199 (emphasis in original and citation omitted). Nonetheless, "defendants can still win on summary judgment if the district court concludes, after resolving all factual disputes in favor of the plaintiff, that the officer's use of force was objectively reasonable under the circumstances." Kopec v. Tate, 361 F.3d 772, 777 (3d Cir. 2004) (citations omitted).

The first issue in evaluating Bilobran's qualified immunity defense is whether,

construing the evidence in the light most favorable to Plaintiff, there is sufficient evidence from which a trier of fact could reasonably conclude that Bilobran's use of force was objectively unreasonable under the circumstances. Thomas v. City of Erie, 236 Fed. Appx. 772, 776 (3d Cir. 2007). Again, the Court accepts Plaintiff's version of the incident as true, but only so far as that version is, pursuant to Heck, consistent with Plaintiff's conviction under section 86-3 of the Hamilton Code, and further, consistent with what occurred in the video of the incident.

This is consistent with the Third Circuit's holding in Nelson v. Jashurek, 109 F.3d 142 (3d Cir. 1997), where the court held that, pursuant to Heck, a prior conviction for resisting arrest did not necessarily bar a plaintiff's claim of excessive force regarding the force the defendant police officer applied in effecting the arrest. Given the elements of the prior conviction, "inasmuch as the jury found [plaintiff] guilty and therefore must have concluded that [defendant] was justified in using 'substantial force' in arresting him, Heck v. Humphrey would bar this action if [plaintiff's] case depended on a demonstration that [defendant] was not justified in using 'substantial force' in arresting him." Nelson, 109 F.3d at 145. However, the court found that this was not the case: "the fact that [defendant] was justified in using 'substantial force' to arrest [plaintiff] does not mean that he was justified in using an excessive amount of force and thus does not mean that his actions effectuating the arrest necessarily were objectively reasonable." Id. Simply because the court found that Heck did not necessarily bar the claim did not mean, however, that Heck was irrelevant to the analysis: "We add an important caveat. The proceedings in the district court must go forward on the basis that [plaintiff's] conviction was valid . . . [I]f this case reaches trial, the trier of fact must be aware that [defendant] was justified in using 'substantial force' in arresting [plaintiff.] Otherwise there would be a danger that in returning a general verdict against [defendant] predicated on a finding that he used excessive

29

force, the trier of fact might base its verdict on findings not consistent with the conclusion the jury reached in the criminal case." Id. at 146. Thus, the district court was directed on remand to either "instruct the jury that [plaintiff] was convicted of resisting arrest . . . or tell the jury that [defendant] was justified in using substantial force to arrest [plaintiff.]" Id. Thus, the Third Circuit made clear that the excessive force claim could only proceed insofar as it was consistent with the prior conviction.

This reading of Nelson is confirmed by the Third Circuit's excessive force analysis in Jennings v. Fetterman, 197 Fed. Appx. 162 (3d Cir. 2006). After stating that the plaintiff "must show that [defendant's] shooting at [plaintiff] was unreasonable in light of the circumstances," Jennings, 197 Fed. Appx. at 164 (citations omitted), the court included the facts underlying the conviction as part of the pertinent "circumstances" to be evaluated: "The District Court reasoned that [plaintiff's] homicide conviction necessarily meant that the jury had rejected [plaintiff's] theory that he had shot at [defendant] in self-defense. The court further explained that a judgment in favor of [plaintiff] on his excessive force claim would contradict this jury finding and, by logical extension, invalidate the attempted homicide conviction . . . [W]e agree." Id.

In accordance with Nelson, this Court does not find that Heck bars Plaintiff's excessive force claim. Rather, I merely find that Plaintiff's claim cannot proceed based on asserted facts that are inconsistent with Plaintiff's conviction under section 86-3. See Mitchell v. Yeadon Borough, Docket No. 01-1203, 2002 WL 265021, *5 (E.D.Pa. Feb. 22, 2002) (granting qualified immunity on an excessive force claim because, "[e]ven if a jury were to find that [plaintiff] engaged in a minimum of conduct consistent with [his conviction for] harassment . . . these facts, combined with the facts we have already discussed in construing the record in [plaintiff's] favor, leave no serious doubt that a reasonable jury could not find that [defendant] engaged in

objectively unreasonable force"); <u>Garrison</u>, 2007 WL 776799 at *7 ("[B]ecause the conviction

and events giving rise to [plaintiff's] excessive force claim are inextricably intertwined, and

because plaintiff pled guilty to assault, an offense for which self-defense is a defense, a judgment

in favor of plaintiff on his excessive force claim would undermine his conviction" and

accordingly "plaintiff's § 1983 claim for excessive force [] is barred").

Though the Court must consider the totality of the circumstances, <u>see</u> <u>Curley v. Klem</u>,

499 F.3d 199, 207 (3d Cir. 2007), it is analytically useful to divide Plaintiff's claim into two

allegations of excessive force, one before and one after his arrest. First, in the context of a

custody dispute in the middle of the police station lobby, in which Plaintiff had repeatedly

ignored police instructions to hand over his granddaughter, Plaintiff contends that Bilobran

forcibly shoved Plaintiff from behind as he was walking toward the door, causing him to take a

few steps forward and use his hand to catch himself against the door of the police station. The

Court notes that Bilobran testified that he made the decision to place Plaintiff under arrest after

this alleged shove, when Plaintiff turned around. Krasny Certificaiton, Exhibit A, 132-33.

Second, according to Plaintiff, Bilobran, after placing Plaintiff under arrest while aided by

another officer, pushed Plaintiff across the lobby, "running with [him] with [his] hands behind

[his] back,"Adezio Certification, Exhibit A, 43:17-18, shoved him against the door head first,

and at the same time, forced his arms toward his head to the point of causing severe pain, until

the door to the backroom was opened.

The Court finds that the evidence is sufficient to create a material issue of fact as to

whether Bilobran used excessive force against Plaintiff <u>subsequent</u> to, but not <u>before</u>, he was

placed under arrest. The <u>Graham</u> and <u>Sharrar</u> factors, which are used to evaluate excessive force

claims in the Third Circuit, <u>Green</u>, 246 Fed. Appx. at 161-62 (3d Cir. 2007), support this

conclusion.

At the outset, the Court notes that the force Bilobran employed against Plaintiff was minimal enough to result in only minor injury. After the incident, Plaintiff claims he "had chest pains" and that his "arm felt like it was wrenched out of the socket." Adezio Certification, Exhibit A, 52:15-17. At the municipal trial, Mrs. Ference testified that Plaintiff complained of "chest pains and back pains" after the incident. Krasny Certification, Exhibit D, 24. Plaintiff went to the hospital, was given X-rays, was allegedly told that the diagnosis was that he had "some soft tissue damage," and he "just took the hot compresses and the Tylenol or whatever they recommended" for the pain. Adezio Certification, Exhibit A, 53:6; 92:15-17. Further, Plaintiff used heat wraps for the next week or so. Id. at 76:1-3. Plaintiff provides no evidence of this diagnosis other than his own description. In this regard, it is important to note that physical injury is not a prerequisite to an excessive force claim, however, whether the "physical force applied was of such an extent as to lead to injury is indeed a relevant factor to be considered as part of the totality." Sharrar, 128 F.3d at 822 (citation omitted).

First, the circumstances surrounding Bilobran's initial shove of Plaintiff, before he was placed under arrest, indicate that the use of minimal force was objectively reasonable as a matter of law. Though two of the Graham factors are inapplicable -- Plaintiff was arrested for a minor offense and was not actively resisting arrest or attempting to evade arrest by flight when he was shoved -- the third factor provides a justification for a minimal amount of force. Given the disturbance caused by Plaintiff in the police station lobby, involving attempts by both Tazza and her mother to grab T.A.F. from Plaintiff's arms and Plaintiff's repeated failure to follow the officers' instructions to diffuse the situation, a reasonable officer "on the scene" could conclude that Plaintiff's presence in the lobby posed an immediate threat to the safety of others. Since

Plaintiff had just caused a disturbance in the lobby of the police station, the "circumstances show some degree of urgency," Saucier, 533 U.S. at 209, in which "a reasonable officer in [Bilobran's] position could have believed that hurrying [Plaintiff] away from the scene . . . was within the bounds of appropriate police responses." Id. at 208.[16] See also Albert v. Weaver, Docket No. 05-2380, 2007 U.S. Dist. LEXIS 59817, *26-27 (M.D.Pa. Aug. 15, 2007) ("Based on the evidence of record -- including the close confines of the precinct, the heated discussion between [the police officer] and [plaintiff] in the hallway, plaintiff's hesitation in complying with the demand to exit, and the relatively minor amount of force exerted, [grasping the plaintiff's arm and escorting him out the building] -- the court finds that no reasonable jury could conclude that [the police officer] used excessive force in securing [plaintiff's] removal from the building") (emphasis added). In the situation that Bilobran confronted, the Court finds it objectively reasonable for him have to hastened Plaintiff's exit with a minor shove. These are precisely the circumstances in which it is important to remember that "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." Graham, 390 U.S. at 396. (citation omitted). Moreover, though Plaintiff claims that Bilobran "forcibly shoved" him from behind, Adezio Certification, Exhibit A, 40:9-11, the push was only hard enough to make him take a few steps forward and touch the door to the police station.

---

[16]This analysis from the Supreme Court took place in the context of the second step of the qualified immunity analysis, "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier, 533 U.S. at 202 (citation omitted). However, the reasonableness of hurrying an uncooperative individual from a situation that reflected some degree of urgency also goes to the first step of the qualified immunity analysis in the case at bar, i.e., whether the force applied by Bilobran was objectively reasonable under the circumstances.

Though some of the <u>Sharrar</u> factors are inapplicable -- there was no reason to believe that Plaintiff was armed and the duration of the police action at issue, i.e., the shove, was minimal -- one factor does weigh strongly in favor of Bilobran. Only two seconds before Bilobran shoved Plaintiff, he was dealing with a volatile situation involving Plaintiff, Mrs. Ference, Tazza, Tazza's mother and T.A.F. Thus, "the number of persons with whom [Bilobran had to] contend [with] at one time," <u>Sharrar</u>, 128 F.3d at 822, adds urgency to the situation, and further serves to justify the minimal force used by Bilobran when he shoved Plaintiff.

Bilobran points to <u>Jones v. City of New Jersey</u>, 45 Fed. Appx. 196 (3d Cir. 2002), as an example of a case involving a similarly appropriate shove. The Third Circuit found that a defendant police officer was entitled to qualified immunity because "[a]t worst, [plaintiff] was shoved by an officer after she tried to meddle in an ongoing drug arrest." <u>Jones</u>, 45 Fed. Appx. at 198. Though Plaintiff was not meddling in an ongoing arrest, he had created a disturbance in the police station lobby and it was reasonable for Bilobran to think that his presence created a risk of further confrontation. <u>Jones</u> is analogous to the case at bar in that, in each case, a police officer used a relatively minor shove while trying to diffuse a volatile situation. While <u>Jones</u> indicates that "some pushes and shoves would violate the Constitution in the right circumstances," <u>Id.</u>, this is not that case. [17]

What distinguishes Bilobran's initial shove of Plaintiff from other relatively minor applications of force which might be constitutionally objectionable is that Bilobran had a reasonable justification for the shove: he sought to end a tense situation in which Plaintiff had

---

[17]Again, although the court was addressing the second step of the qualified immunity analysis, the principle that the use of minimal force when responding to a volatile situation is reasonable is also relevant to the first part of the qualified immunity analysis, i.e., whether the force applied by Bilobran was objectively reasonable under the circumstances.

34

repeatedly disobeyed police instructions. This scenario differs from that presented by the case of Alexis v. McDonald's Restaurants of Massachusetts, 67 F.3d 341 (1st Cir. 1995), where the plaintiff was directed by a police officer to leave a McDonalds for creating a disturbance. She was told that if she was still present when backup arrived, she would be arrested. When she was told that she was under arrest, "without asking or directing [the plaintiff] to get up from the table, [the police officer] suddenly and violently grabbed and pulled her [body] from the booth and across the table, handcuffed her hands tightly behind her back, and, with the help of [another officer], dragged her from the booth, bruising her legs in the process." Alexis, 67 F.3d at 346. The court was not convinced that "the force with which [the officer] effected the sudden, unannounced, violent seizure and removal of [plaintiff's] person was objectively reasonable, especially since there is no evidence or suggestion that [plaintiff] posed a risk of flight, attempted to resist or evade arrest, or threatened the peace, property or safety of anyone," Id. (citation omitted), and therefore denied the officer's motion for summary judgement. On the other hand, here, Bilobran clearly had reason to believe that Plaintiff's continued presence in the police station lobby "threatened the peace, property or safety" of those present.

Next, the Court turns to Plaintiff's allegations of excessive force subsequent to his arrest. Plaintiff's second allegation of excessive force comprises him being (1) pushed across the police office lobby, and then (2) shoved against a closed door head first, with his arms painfully twisted towards his head. The question at this point is whether there is sufficient evidence from which a jury could reasonably conclude that these actions were objectively unreasonable under the circumstances. Thomas, 236 Fed. Appx. at 776.

A reasonable jury could find that this alleged application of force by Bilobran occurred in a different context than the initial shove. By the time Bilobran had placed Plaintiff under arrest

35

and was pushing him across the lobby of the police station, a reasonable jury could find that the situation in the lobby had been diffused. T.A.F. had been delivered to her mother and the parties to the dispute had either left or were in the process of leaving the station. According to the video, Mrs. Ference had handed T.A.F. to Tazza around the time of 19:51:51, and the Tazzas were no longer visible in the lobby as of 19:51:55. It was not until 19:52:05, some ten seconds later, that the video captures Bilobran and another officer pushing Plaintiff across the lobby. It was not until 19:52:08-09 that Plaintiff was allegedly shoved up against the door and his arms were allegedly twisted toward his head. That amounts to roughly fifteen seconds between the time the parties to the dispute in the lobby had left and the time that Plaintiff was shoved against the door.

Further, at this stage of the proceedings, the Court must accept Plaintiff's version of the events that precipitated his arrest, which occurred outside the purview of the video. According to Plaintiff, after he was initially shoved by Bilobran, he did nothing to provoke his arrest. Rather, he contends that Bilobran assumed a boxing stance and started chiding Plaintiff. Adezio Certification, Exhibit A, 41:1-5. Then, Plaintiff contends, Bilobran and another officer placed him under arrest.

Subsequent to Plaintiff's arrest, the video captures Bilobran and another officer pushing Plaintiff across the lobby. At the time of 19:51:08-09, the video depicts Plaintiff being pushed up against the door or the wall. The video reveals that this lasted for at most two to three seconds while the door to the holding room in the back of the police station was opened. Although the video does not indicate the force with which Plaintiff was pushed against the wall and his arms allegedly twisted, the video is capable of being viewed as consistent with Plaintiff's version of the story -- that "they ran me into the closed door face first." Id. at 45:22. Moreover, the video shows that Plaintiff was pushed across the lobby with a moderate amount of force (the officers

36

are leaning into him), which implies that he could have been shoved against the door with the same force. Importantly, Bilobran does not argue that Plaintiff resisted arrest, and the video is not to the contrary. After the incident, Plaintiff claims that his arm felt "like it was wrenched out of the socket." Id. at 52:15-17.

When assessing the reasonableness of Bilobran's actions, Sharrar instructs courts to consider "whether the action takes place in the context of effecting an arrest," Sharrar, 128 F.3d at 822. In this context, the Court is mindful that "Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it,", and that not every shove constitutes excessive force. Graham, 490 U.S. at 396 (citations omitted).

Having placed Plaintiff under arrest, the Court concludes that it was objectively reasonable as a matter of law for Bilobran to push Plaintiff across the lobby. Given Plaintiff's earlier conduct, Bilobran had reason to believe that verbal instructions alone might not be sufficient to get Plaintiff to the holding room. That, in Plaintiff's words, the police officers "were like running with me with my hands behind my back" while pushing him to the holding room is not by itself objectively unreasonable. Adezio Certification, Exhibit A, 43:17-19. Were it otherwise, police officers might have to rely on verbal instructions alone to effect an arrest for fear of section 1983 liability. See Albert, 2007 U.S. Dist. LEXIS 59817 at *26-27 (grabbing plaintiff's arm and physically escorting him out of the police station was objectively reasonable where plaintiff failed to follow police instructions).

However, the Court finds that, construing the evidence in the light most favorable to the Plaintiff, a reasonable jury could find that Bilboran shoving Plaintiff against the door head first and painfully twisting his arms amounted to excessive force. A reasonable jury could conclude

37

that by the time this application of force took place, the disruption in the police station lobby, though caused by Plaintiff, had ended. The Tazzas were out of the purview of the video, presumably (as the Plaintiff asserts) having left toward an exit, nearly 15 seconds before the allegedly offending actions taken by Bilobran. With respect to this specific incident of alleged excessive force, the Graham factors weigh in favor of Plaintiff.  He was under arrest for a minor crime and was not resisting arrest. Graham, 490 U.S. at 396. As to the third factor, whether, at the time, Plaintiff posed an immediate threat to the safety of the officers or others present, Id., it is important to note that nearly fifteen seconds had elapsed since the situation in the lobby had ended (i.e., the child being turned over to Tazza) and thus, a reasonable jury could find that Plaintiff no longer posed a danger to anyone. Though Plaintiff had failed to follow police instructions when he refused to deliver T.A.F. to Tazza, Plaintiff claims (and the for purposes of summary judgment the Court must accept) that he did not act aggressively toward Bilobran to provoke his arrest, and the video indicates that he cooperated once he was arrested. Applying the Sharrar factors, there was no reason to think that Plaintiff was armed, and at the time of the second shove, the police only had to deal with two individuals, Plaintiff and his wife. Sharrar, 128 F.3d at 822. Two Sharrar factors cut in favor of Bilobroan: his actions took place in the context of effecting an arrest and the shoving of Plaintiff and twisting of his arms was very brief, lasting at most several seconds. Id.

Considering the totality of the circumstances, and assuming Plaintiff's version of the events to be true, a reasonable jury could find that shoving Plaintiff against the door head first and twisting his arms was objectively unreasonable. A police officer's authority to effect an arrest may come with "the right to use some degree of physical coercion . . . to effect it," Graham, 490 U.S. at 396, but there must be a reasonable justification for that coercion. "A

plaintiff may bring a claim pursuant to § 1983 where police use more force than is necessary to arrest him." <u>Thomas</u>, 236 Fed. Appx. at 776 (3d Cir. 2007) (citation omitted). With respect to Bilobran's second shove of Plaintiff, where his head was pushed against the door and his arms were twisted, and <u>only</u> that part of Plaintiff's excessive force claim, a reasonable jury could find that there was insufficient justification for the degree of force allegedly applied by Bilobran.

It is instructive to compare Plaintiff's claim of excessive force to an excessive force claim that the Third Circuit recently rejected in <u>Thomas</u>. In that case, the police hit the plaintiff's head against the door of a police van while effecting an arrest, even though the plaintiff claimed he did not resist arrest. <u>Id.</u> at 774. In rejecting the plaintiff's excessive force claim, the court held that "even if the police hit plaintiff's head against the door when placing him in the police van, there is no evidence that it was done intentionally or that [plaintiff] suffered any injury." <u>Id.</u> at 776. The difference between <u>Thomas</u> and the case at bar is the commonsense difference between an accidental bump on the head and shoving someone against a wall and twisting his arms. Of course, the question, implicit in the <u>Graham</u> and <u>Sharrar</u> factors, is the <u>need</u> and <u>justification</u> for the degree of force used under the circumstances. Since a reasonable jury could find that the disruption in the lobby had been diffused and Plaintiff was cooperating with the police officers by the time they were approaching the door to the holding room, a reasonable jury could also find that there was no need for the level of force allegedly applied by Bilobran. A reasonable jury could find that this was not simply a bump on the head in the course of effecting an arrest, as if, for example, Bilobran had bumped Plaintiff's head against the wall or door while taking him through the door of the holding room. If Plaintiff's version of the events is true, which includes Bilobran taunting Plaintiff by striking a boxing pose prior to his arrest, a reasonable jury could determine that shoving Plaintiff against the door head first and twisting his arms

39

constituted an unnecessary use of force, rather than either a mere accident while transporting

Plaintiff to the holding room, or a reasonable consequence of an appropriate level of restraint

used under the circumstances. If the record is read in the light most favorable to Plaintiff,

Bilobran's actions could cause a jury to believe that Bilobran intended to inflict unwarranted

discomfort and pain on Plaintiff, which is conduct that fails the test of objective reasonableness.

Therefore, Plaintiff's excessive force claim subsequent to his arrest, regarding Bilobran's alleged

shoving of Plaintiff against the door and twisting of his arms, survives the first step in the

qualified immunity analysis.

**b. Qualified Immunity Defense: Step Two**

The second step in the qualified immunity analysis "permits officers to make reasonable

mistakes about what is lawful." Jones, 45 Fed. Appx. at 197 (citation omitted). It is important to

note that "even where reasonableness is a part of the inquiry for both the constitutional question

and for qualified immunity, as it is in an excessive force case, the inquiries remain distinct."

Curley, 499 F.3d at 207. The Third Circuit has recently outlined the second step of the qualified

immunity inquiry in the context of an excessive force claim:

> Having determined that a reasonable jury could find a constitutional violation
> based on the alleged facts, we next consider whether [plaintiff's] rights in this
> specific context were "clearly established." To conclude that a right is "clearly
> established," "[t]he contours of the right must be sufficiently clear that a
> reasonable official would understand that what he is doing violates that right."
> Thus, "[t]he relevant dispositive inquiry in determining whether a right is clearly
> established is whether it would be clear to a reasonable officer that his conduct
> was unlawful in the situation he confronted." Officers who make reasonable
> mistakes as to what the law requires are entitled to qualified immunity, which
> "operates . . . to protect officers from the  sometimes hazy border between
> excessive force and acceptable force." In the context of excessive force claims,
> we have relied on the factors set forth in Graham and Sharrar in evaluating
> whether an officer made a reasonable mistake. We have stated that the factors
> "are well-recognized," and that when an officer applies them in "an unreasonable
> manner, he is not entitled to qualified immunity."

40

Green, 246 Fed. Appx. at 161-62 (citations omitted).

Thus, at this point in the qualified immunity analysis, the issue is no longer whether a reasonable jury could find, given Plaintiff's version of the events, that Bilboran's actions were objectively unreasonable. The point of the second step in the qualified immunity analysis is that room for reasonable disagreement about the application of the law is not enough. Plaintiff's claim can only survive the second step of the qualified immunity analysis if, given his version of events, there is no room for reasonable disagreement among reasonable police officers as to the lawfulness of Bilobran's actions: "Officers who make reasonable mistakes as to what the law requires are entitled to qualified immunity." Green, 246 Fed. Appx. at 162. Thus, the right at issue is "clearly established" only if "it would be unreasonable for officers to believe that [Bilobran's actions] would not constitute excessive force." Id. at 163. See also Tofano v. Reidel, 61 F.Supp.2d 289, 304 (D.N.J.1999) (stating that "if reasonable officers could believe that a certain course of conduct is unlawful but other reasonable officers could believe that the conduct was lawful, qualified immunity attaches").

Construing the record in the light most favorable Plaintiff requires the Court to draw the following inferences: Plaintiff did not respond aggressively to Bilobran when he was pushed on his way out of the police station; Plaintiff cooperated once placed under arrest; and nearly fifteen seconds after the volatile situation in the lobby subsided, Bilobran shoved Plaintiff into the door head first and painfully twisted his arms toward his head. When the Court draws those inferences, there is no room for reasonable disagreement about the fact that Bilobran's use of force was objectively unreasonable.

At the point when Bilobran allegedly pushed Plaintiff against the door head first and

twisted his arms, Plaintiff was being escorted by Bilobran and another police officer across the police station lobby and into a holding room. As the Court indicated earlier, it was reasonable to forcibly escort Plaintiff across the lobby rather than merely ask him to walk towards the holding room. It would also have been reasonable for one of the officers to continue to hold or restrain Plaintiff while the door to the holding room was opened. Again, the Fourth Amendment does not require Bilobran to have relied upon verbal instructions alone to effect an arrest, especially where Plaintiff had previously failed to comply with police instructions.

However, the fact that a police officer is effecting an arrest only gives him license to use the force that is necessary: a "plaintiff may bring a claim pursuant to § 1983 where police use more force than is necessary to arrest him." Thomas 236 Fed. Appx. at 776 (citation omitted). Given that a jury could find that Plaintiff posed no danger to anyone at the time, there was simply no justification to shove Plaintiff against the door head first and painfully twist his arms while the door was opened. Therefore, such conduct cannot reasonably be thought to be "within the bounds of appropriate police responses." Saucier, 533 U.S. at 208. This is not an allegation of an accidental bump or bruise inflicted in the course of effecting an arrest and, further, if Plaintiff's allegations are true, Bilobran's actions were not truly taken in the course of effecting Plaintiff's arrest. Rather, running Plaintiff into the door and twisting his arms constituted a separate, independent course of conduct, serving no purpose other than to inflict discomfort and pain. This is not the "hazy border between excessive and acceptable force." Green, 246 Fed. Appx. at 162 (quoting Saucier, 533 U.S. at 206).

The Court does not need to cite a specific case to properly find that the law on this point is "clearly established." As the Third Circuit has recently explained: "In the context of excessive force claims, we have relied on the factors set forth in Graham and Sharrar in evaluating whether

42

an officer made a reasonable mistake. We have stated that these factors 'are well-recognized,' and that when an officer applies them in 'an unreasonable manner, he is not entitled to qualified immunity.'" Id. at 162-63 (citations omitted). The analysis in the previous section, see section IV. D. 4. a. supra, indicates that no reasonable application of the Graham and Sharrar factors could justify Bilboran's alleged use of force under the circumstances. The mere fact that Plaintiff was under arrest, coupled with the fact that the use of force was brief, which are the only two Graham and Sharrar considerations weighing in Bilobran's favor, is not enough for Bilobran to have reasonably thought it was lawful to shove Plaintiff against the door head first and painfully twist his arms. Assuming the foregoing facts to be true on this motion, there is no room for a reasonable legal mistake about the matter. Thus, with respect to Plaintiff's claim that Bilobran shoved Plaintiff against door and painfully twisted his arms, Bilobran is not entitled to the defense of qualified immunity, and Bilobran's motion for summary judgment is denied. A jury will have to decide the facts based upon its assessment of the evidence and then, based upon those proven facts, whether the force was excessive.

**V. Conclusion**

For the foregoing reasons, the Municipal Defendants are entitled to summary judgment on Plaintiff's section 1983 claims of malicious prosecution, retaliatory prosecution, abuse of process, false arrest and false imprisonment. Bilobran is entitled to summary judgment on Plaintiff's section 1983 claims of malicious prosecution, retaliatory prosecution, abuse of process, false arrest and false imprisonment. However, Bilobran's motion for summary judgment with respect to Plaintiff's section 1983 claim of excessive force is denied. An appropriate Order will follow.

Dated: February 6, 2008

/s/ Freda L. Wolfson
Honorable Freda L. Wolfson
United States District Judge